**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. 25-MJ-19 (MJS)** |
| | : | |
| **RYAN MICHAEL ENGLISH,** | : | |
| Also known as "Riley Jane English," | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**</u>

Ryan Michael English (hereinafter, the "Defendant") planned and took significant steps to kill multiple members of the new presidential administration. She did so, in her words, in order to "depose" the United States' political offices and "send a message." The criminal conduct for which she is before the Court is not a momentary lapse in judgment; rather, it was a premeditated and calculated attempt to commit violence.

One day before her arrest, the Defendant traveled from her home in Massachusetts to the District of Columbia, and along the way, purchased bottles of vodka to create Molotov Cocktails. Her plan, as she described to United States Capitol Police Officers, was to kill the Secretary of Defense, kill the Speaker of the House, or burn down a conservative think tank located in the District. On the way to the District, she switched her target, this time to the nominee for Secretary of the Treasury.

She described her plan to officers – to either throw her Molotov Cocktails at the feet of the nominee for Secretary of the Treasury, or otherwise stab him to death using a knife she carried on her person. When she arrived to the Capitol (on foot and without her phone so law enforcement could not track her, as she admitted), she spent around an hour surveilling the Capitol to determine

the level of security and any possible entrance points. Realizing the level of security present, the Defendant acknowledged that she would have to kill "at least" three United States Capitol Police Officers to get close enough to her intended victim.

In her confession to Capitol Police, she recognized her actions would put herself in grave danger as well, and expressed acceptance that she would likely commit "suicide by cop" in the process. She explained she was diagnosed with a terminal illness and "wanted to do something before I go."

Given the nature of the Defendant's actions, there are no condition or combination of conditions of release that will reasonably assure the safety of any other person and the community, and the Defendant should be detained pending resolution of this case.

## PROCEDURAL POSTURE

On January 28, 2025, the Defendant was charged by Complaint with Unlawful Receipt, Possession, and/or Transfer of a Firearm, in violation of 26 U.S.C § 5861, and Carrying a Firearm, Dangerous Weapon, Explosive, or Incendiary Device on the Grounds of the U.S. Capitol, in violation of 40 U.S.C. § 5104(e)(1)(A). Section 5861(d) of Title 26 provides that it is "unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record," and a "Firearm" is defined as including, *inter alia*, a "Destructive Device." 26 U.S.C. § 5845(a). Section 5845(f) likewise defines a Destructive Device as, "any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device." 26 U.S.C. § 5845(f). Importantly, these definitions of "Destructive Device" cover devices *intended* for use as a destructive device. The statutes read:

> Any combination of parts either *designed or intended* for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon . . .

*Id.* (emphasis added). This is identical to the definition of "Destructive Device" contained in the Bail Reform Act. 18 U.S.C. § 3142(f)(1)(E); 18 U.S.C. § 921(a)(4) (defining "Destructive Device").

Accordingly, the relevant statutes describe two general categories of "Destructive Devices": (1) assembled devices, whether they are functional or nonfunctional, and (2) a combination of parts that can quickly and easily be converted into a functional Destructive Device.

During the Defendant's Initial Appearance, the Government moved for the Defendant's pretrial detention under 18 U.S.C. § 3142(f)(1)(E) (Felony Involving a Destructive Device). During that hearing, the Defendant, through counsel, argued that a Molotov Cocktail does not constitute a "destructive device" when it cannot ignite, proffering a number of cases in support of her position. *United States v. Singleton*, 182 F.3d 7 (D.C. Cir. 1999); *United States v. Blackburn*, 940 F.2d 107 (4th Cir. 1991); *Burchfield v. United States*, 544 F.2d 922 (7th Cir. 1976); *Langel v. United States*, 451 F.2d 957 (8th Cir. 1971). As discussed below, none of these cases are persuasive, or in some cases, even relevant. And more importantly, federal courts uniformly have held that the definition of "Destructive Device" includes a nonfunctional device. *United States v. Johnson*, 15-CR-125 (KBJ), 2019 WL 3842082, at *3 (D.D.C. 2019) (citing cases).

## APPLICABLE AUTHORITY

A Molotov Cocktail is a hand-thrown incendiary weapon consisting of a container filled with flammable substances and equipped with a fuse (typically a glass bottle filled with flammable liquids sealed with a cloth wick). *See, e.g.*, *United States v. Graziano*, 616 F. Supp. 2d 350, 362

(E.D.N.Y. 2008). In use, the fuse attached to the container is lit and the weapon is thrown, shattering on impact. This ignites the flammable substances contained in the bottle and spreads flames as the fuel burns.

The First, Second, Fourth, Fifth, Eighth, and Tenth Circuits have held that Molotov Cocktails fall with within the definition of a Destructive Device under Section 5845 and Section 921(a)(4)(A) of the Title 18 (both of which use the same definition of "Destructive Device" as the Bail Reform Act). *United States v. York*, 600 F.3d 347, 354 (5th Cir. 2010) (holding that a Molotov Cocktail constitutes a "Destructive Device" under 18 U.S.C. § 921(a)(4)(A)); *United States v. Simmons,* 83 F.3d 686, 687 (4th Cir.1996) ("[C]ourts have uniformly held that a fully-assembled Molotov cocktail—defined as a device comprising a bottle, gasoline, and a rag—constitutes an 'incendiary ... bomb' or 'similar device' under section 5845(f).") (citing cases); *United States v. Buchanan*, 787 F.2d 477, 479 (10th Cir.1986) (affirming the conviction where a device consisted of a plastic milk container filled with gasoline and charcoal fluid was lit with a fuse made of rags); *States v. Ragusa,* 664 F.2d 696, 697, 699–700 (8th Cir.1981) (finding that a device consisting of "six trash bags, each holding a five-gallon container of gasoline, suspended in various locations and connected by overlapping paper towels trailing throughout the house" qualified as an incendiary bomb under § 5845(f)); *United States v. Wilson,* 546 F.2d 1175, 1177 (5th Cir. 1977); *United States v. Curtis*, 520 F.2d 1300, 1304 (1st Cir.1975); *United States v. Cruz*, 492 F.2d 217, 219 (2d Cir.1973) (holding that a Molotov cocktail does constitute a destructive device); *United States v. Ross*, 458 F.2d 1144, 1145–46 (5th Cir.1972) ("A Molotov Cocktail has no use other than as a weapon, and a person may be charged with knowledge of its similarity to a grenade"). *See also United States v. Graziano*, 616 F.Supp.2d 350, 362–63 (E.D.N.Y.2008) (looking at the text of section 921 and surveying the cases from the various

circuits to conclude that a Molotov cocktail is a destructive device within the definition of section 921).

I.    **A Molotov Cocktail, Even when Incapable of Ignition, Constitutes a "Destructive Device" Under 26 U.S.C. § 5845**

The Molotov Cocktails possessed by the Defendant in this case were two 50 milliliter bottles of Absolut brand vodka, with grey cloth soaked in hand sanitizer affixed to its top. While the government's experts have not yet made a final determination of the operability of these devices, it appears preliminarily that these Molotov Cocktails would have been unable to ignite because 80 proof Vodka is not flammable. Nonetheless, these Molotov Cocktails are still "Destructive Devices" under the law. *See, e.g. United States v. Verna*, 113 F.3d 499, 501 (4th Cir. 1997) (a package bomb designed to explode when the package was opened was still a "Destructive Device" despite the bomb-maker's mistaken use of two ignitors which rendered the bomb nonfunctional); *Simmons,* 83 F.3d 686 (a Molotov Cocktail absent a way to light the wick, is still a "Destructive Device"); *United States v. Hamrick*, 43 F.3d 877, 884 (4th Cir. 1995) ("*Hamrick II*") (dysfunctional bomb still considered a "Destructive Device" notwithstanding the fact it did not detonate as intended); *United States v. Ragusa*, 43 F.3d 877, 700 (8th Cir. 1981) (a Molotov Cocktail that could "not have functioned as intended" is still a "Destructive Device" because "it is not necessary that the device actually function as intended") (citing *United States v. Evans*, 526 F.2d 701, 707 (5th Cir. 1976); *United States v. Rushcamp*, 526 F.2d 1380, 1382 (6th Cir. 1975)); *Wilson,* 546 F.2d at 1177 ("The purpose of [Section 5845(f)] would be defeated by any interpretation which excluded from coverage home-made bombs having no lawful use simply because one of the components was dynamite, a material not in it of itself regulated as a firearm . . .").

Take the Fourth Circuit's opinion in *Hamrick II*, for example. There, the defendant built a bomb and mailed it to an Assistant United States Attorney responsible for his prior prosecution. 43 F.3d at 878. If fully effective, the bomb was designed to produce a fireball and burn the skin and eyes of anyone who was exposed to it. *Id.* at 879. However, when the intended recipient opened it, the bomb scorched the package but did not otherwise detonate. *Id.* A prior panel of the Fourth Circuit reversed five of the defendant's convictions under 26 U.S.C. § 5861, holding that the defendant's bomb was not a destructive device because not all of the necessary component parts of a bomb were actually in the defendant's possession and working. *United States v. Hamrick*, 995 F.2d 1267, 1271 (4th Cir. 1993) (*"Hamrick I"*) ("The bomb was incapable of detonating; therefore it cannot be a destructive device under section 5845(f) or its counterparts.").

Two years later, the Fourth Circuit reversed its decision in *Hamrick I*, finding that the defendant's dysfunctional bomb was, in fact, a "Destructive Device." *Hamrick II*, 43 F.3d at 884. In doing so, the *Hamrick II* court explained that "the display of a bomb, like the display of a gun, instills fear in the average citizen, whether or not it is actually capable of inflicting injury." *Id.* at 882. The court cited numerous opinions where other jurisdictions have held inoperable devices still constituted "Destructive Devices" within the meaning of the statutes. *Id.* And most relevant to this case in particular, the court explained how an inoperable destructive device still causes relevant law enforcement authorities to "respond to the perceived threat of explosion," which will increase the chances police "respond with force and possibly deadly force, and thereby endanger the safety of victims, bystanders, and even the perpetrators." *Id.* (citing *United States v. Martinez-Jiminez*, 864 F.2d 664, 666 (9th Cir. 1989)).

The Defendant here, by her own admission, intended these two Molotov Cocktails as devices that would kill members of the new presidential administration. ECF No. 1, at ¶ 15. While

6

Absolut brand vodka may not be a liquid that can cause an ignition, the Defendant clearly believed that it would. *Id.* Indeed, when a law enforcement officer asked the Defendant, "Is that really a Molotov cocktail?", the Defendant responded, "Well, it works."

II.    **The Authorities Cited by the Defendant are Unpersuasive**

None of the authorities cited by the Defendant at the prior hearing support the position that a Molotov Cocktail does not constitute a "destructive device" when it cannot ignite.

In *Singleton*, our Circuit analyzed whether those accused of violating 18 U.S.C. § 922(g) (Unlawful Possession of a Firearm by a Person Previously Convicted of a Crime Punishable by More than a Year of Imprisonment) fell within the category of violent crimes that trigger detention hearings. 182 F.3d at 9. In fact, nowhere in the opinion does the Circuit discuss "destructive device." Defendant cited *Singleton* merely for the proposition that one of six circumstances under 18 U.S.C. § 3142(f) must be present to trigger a detention hearing.   As explained above, 18 U.S.C. § 3142(f)(1)(E) applies.

In *Blackburn*, the Fourth Circuit's opinion analyzed a discrete issue within the 1991 United States Sentencing Guidelines: "did the district court err as a matter of law or misapply the guidelines in counting twenty-eight inert grenades as 'firearms' as that term is used in the 'specific offense characteristics' subsection of U.S.S.G. § 2K2.2?" 940 F.2d at 108. While the *Blackburn* court did "draw upon a wealth of caselaw involving § 5861 convictions" in its analysis, the dispute was whether an inert grenade, which required the addition of powder and fragments to make it an active grenade, could constitute a "Destructive Device" under Section 5861. *Id.* at 109. And more generally, the issue was whether a person can be deemed to be in possession of a "Destructive Device" if he does not possess one of the requisite parts or ingredients needed to activate the device. *Id.* at 110. Notwithstanding this question appeared in the context of *de novo* review on

7

appeal, the Defendant possessed a completed device, not parts, but one of those parts (the liquid in the bottle) just happened to be inoperable in connection with the Defendant's intended design. *Blackburn*, and the cases upon which it relied, deals with whether a defendant possessed "the requisite parts or ingredients" from which a destructive device "may be readily assembled." *Id.* at 110.

In *Langel*, defendants convicted of possessing sticks of ammonium dynamite and nitroglycerin argued they were not "Destructive Devices" within the meaning of 26 U.S.C. § 5845(f). *Langel*, 451 F.2d at 962. The Eighth Circuit addressed this issue quickly, concluding that the device in question was, in fact, a Destructive Device. *Id.* (quoting *United States v. Oba*, 448 F.2d 892 (9th Cir. 1971)). Nothing in the *Langel* court's opinion discusses Molotov Cocktails, or otherwise bears relevance to the issues before the Court.   In *Langel*, the Eighth Circuit also cited a Ninth Circuit's answer to a similar homemade bomb: "In light of the nature of this device and its admitted purpose, it seems absurd to even question its inclusion within the definition of 'destructive device' approved by Congress, or to assert that it is not a weapon." *Id.* (quoting *United States v. Oba*, 448 F.2d at 929 n.1).

Finally, in *Burchfield*, a defendant pled guilty to one count under 26 U.S.C. § 5861(d), and later filed a motion to vacate that sentence on the grounds that the indictment to which he pled failed to state an offense against the laws of the United States. 544 F.2d at 923.   Defendant was in possession of: "three sticks of "Austin" brand 40% dynamite each marked B1356003-02-12227104 and three 'Atlas' brand electric blasting caps with orange and yellow leg wires, one six-volt lantern battery and one coil of red plastic-covered power cord." *Id*. The defendant challenged that the indictment did not charge in the statutory words applicable to a combination of parts either "designed or intended for use." *Id*. at 925. Ultimately, the Court upheld the conviction. *Id*.

Notwithstanding the procedural differences between the two cases, here the complaint does not allege a "combination of parts," but rather a completed device that (luckily) had one inoperable element.

## I.    Legal Authority and Argument

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e).

The Act provides, however, for certain crimes, that there is a rebuttable presumption that no conditions or combinations of conditions will assure the safety of the community. *See id.* As is relevant to this case, the Act provides rebuttable presumptions for cases where there is probable cause to believe the defendant attempted to assassinate a person nominated to be head of a department of the executive branch of the Government in violation of 18 U.S.C. § 351. *Id.* § 3142(e)(3)(C). The crimes triggering such rebuttable presumptions need not be expressly included in the charging instrument. *See United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988) (holding that "the complaint need not allege a violation of one of the particular predicate offenses for the presumption to come into play.")  Instead, "[if] the facts establish probable cause that the defendant has [committed such an offense], the judicial officer should give proper weight to Congress's general factual view that the defendant poses an unreasonable risk of danger to the community when applying the § 3142(g) factors."  *Id.*

While 18 U.S.C. § 351 is not listed in the complaint, the facts alleged in that complaint provide probable cause to believe the defendant violated that statute, which provides that: "Whoever attempts to kill any individual designated in subsection (a) of this section shall be

punished by imprisonment for any term of years or for life." 18 U.S.C. § 351(c). Individuals designated in subsection (a) include "a member of the executive branch of the Government who is the head, or a person nominated to be head during the pendency of such nomination, of a department listed in section 101 of title 5". 18 U.S.C. § 351(a). The nominee for Secretary of the Treasury Department qualifies as an individual under subsection (a).   Additionally, as proffered below and described in the complaint affidavit, the Defendant admitted that the Defendant arrived at the U.S. Capitol with a homemade incendiary device with the intent to kill the nominee for Secretary of the Treasury Department.

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors:   (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.   *See* 18 U.S.C. § 3142(g).

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing."   18 U.S.C. § 3142(f).   Specifically, the presentation of hearsay evidence is permitted and the government may proceed by proffer.   *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996).   Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use."   *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986).   *See also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992).   A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues.   *See Smith*, 79 F.3d at 1210, *see Williams*, 798 F. Supp. at 36.

Because there is probable cause to believe that the Defendant violated 18 U.S.C. § 351, the Court must presume that no condition or combination of conditions will reasonably assure the safety of the community.   A review of the 3142(g) factors makes clear that the defense cannot overcome these presumptions.

**A.  Nature and Circumstances of the Offense Charged**

The nature and circumstances of the offenses charged weigh heavily in favor of detention. The Defendant planned and took significant steps to kill multiple members of the new presidential administration.   This was not a spur-of-the-moment decision.   The Defendant planned the attack well in advance and then took multiple concrete steps to effectuate this plan.   The Defendant traveled from Massachusetts to Washington, D.C. to "send a message" to the new presidential administration.

*Late December 2024 – Mid January 2025*

During a custodial interview with law enforcement officers on January 27, 2025, the Defendant admitted to planning this trip to Washington, D.C. about one month ago.   The Defendant bought an atlas with cash, to avoid any tracing of the transaction. When the Defendant went to purchase the atlas, the Defendant also wore clothes to conceal the Defendant's appearance and left any cell phone at home to avoid surveillance. The Defendant purchased the atlas to navigate to Washington, D.C., given that the Defendant knew she would not have a phone with GPS capability.   A photo of the atlas found in the Defendant's car is depicted below.

11



*A photo of an atlas recovered from the Defendant's vehicle*

<u>January 26, 2025</u>

As stated to law enforcement officers in the custodial interview, on January 27, 2025, the Defendant left Massachusetts, where the Defendant resides, to travel to Washington, D.C.   As planned, the Defendant purposefully left her mobile phone at home in Massachusetts so that the Defendant's travel and whereabouts could not be surveilled. The Defendant then traveled to Washington, D.C. with the intention of killing the "Nazi" Secretary of Defense, and/or the Speaker of the House, and/or burning down a think tank based in Washington, D.C. that is located "two blocks from the White House." The Defendant explained that these actions were specifically to "depose" these political offices and send a message.   On the evening of January 26, the Defendant stayed overnight at a rest stop somewhere in New Jersey.

On the Defendant's way to Washington, D.C., the Defendant stopped at a library in Chevy

Chase, Maryland, observed Reddit posts mentioning the confirmation hearings of the Secretary of the Treasury, and altered the Defendant's target.

The Defendant also purchased alcohol bottles on the way to Washington, D.C. for the intended purpose of constructing a destructive device. Originally, the Defendant's thoughts were to use the small bottles of vodka to start fires. Later, the Defendant's plan was to wrap the bottles in rags soaked in alcohol, light the rags, and throw the devices at her target's feet.

*January 27, 2025*

On Monday, January 27, 2025, at approximately 1:57 PM, the Defendant arrived on the U.S. Capitol Grounds. From 1:57 PM until approximately 3:12 PM, the Defendant walked loops around the grounds of the U.S. Capitol, scouting and surveilling the grounds. According to the Defendant's statements during the custodial interview, the Defendant surmised that the Defendant would have to kill, "at least," three U.S. Capitol Police Officers to get to the nominee and kill him. The Defendant recognized that these actions were likely to put the Defendant in grave danger and expressed acceptance and content with the possibility of suicide by cop.

At approximately 3:12 PM, at 1 First Street NW, near the South Door of the U.S. Capitol Building, the Defendant approached a Capitol Police Officer (hereinafter "CPO-1") and stated "I'd like to turn myself in." The Defendant further admitted to being in possession of multiple knives and what the Defendant referred to as two "Molotov Cocktails".

The Defendant was detained and searched by CPO-1 and another Capitol Police Officer (CPO-2). While being searched, the Defendant stated "I've got a knife in my pocket, and Molotovs in my jacket." The search of the Defendant uncovered a folding knife in the front right pants' pocket, as well as two destructive devices from the inside pockets of a jacket. The destructive devices were constructed of 50 milliliter bottles of Absolut brand vodka with a grey cloth affixed

to its top. A green BIC brand lighter was also recovered from the Defendant's pants' pocket.

While being searched, the Defendant stated that the bottle contained "Vodka, hand sanitizer on the rag, and a lighter."    When asked, "Is that really a Molotov cocktail?", the Defendant responded, "Well, it works."    Shortly thereafter, the Defendant declared that she went to the Capitol that day to kill the nominee:

> Q.    What are you doing here today?
> A.    I was going to kill Scott Bessent.
> Q.    Kill Scott Bessent?
> A.    Yes, sir.

The Defendant's car was located in the 900 Block of Independence Ave SW. A law enforcement officer asked whether the Defendant left anything on the ground when walking from the car to the U.S. Capitol. The Defendant responded, "No. I don't want to hurt anyone . . . I don't want to hurt people. That's why I turned myself in." Law enforcement officers searched the Defendant's car for additional destructive devices. The search uncovered a 750 milliliter bottle of Smirnoff 100 proof vodka and a grey sweatshirt with cloth cut from the sleeves. The cloth of this sweatshirt was consistent with the cloth affixed to the destructive devices. In the initial moments after her arrest, the Defendant stated she left the larger bottle of vodka in her car because it "looked dumb in my jacket, so I got the smaller ones."

During a search of the Defendant's person prior to transport, law enforcement officers recovered a receipt in the Defendant's back left pants' pocket.    On the back of the receipt was written:



*A photo of a hand-written note found in Defendant's pocket*

Additionally, as depicted below, the words "NO FUTURE NO CHOICE" were hand-written on the Defendant's arm.



*A photo of the Defendant's arms*

During the custodial interview on January 27, the Defendant discussed what brought her to Washington, D.C.  The Defendant told officers "pretty much the words on my arms say everything."  The Defendant also informed officers that she had a congenital heart defect, and only had four months to live.  Regarding her intent and plans for traveling to Washington, D.C. that day, the Defendant told officers:

- "I'd been thinking about this for a while, not this specifically I'd just been thinking about doing good and being good."

- "I didn't have a plan when I came down here. I've been wanting to devote my life… I've always wanted to live for other people… My life doesn't mean anything anymore the only thing I can do is help other people."

- "I didn't have a plan in my mind. I felt like I had to do this. I felt like I was on a mission . . .  Maybe I told myself to have faith and just see where this goes and I had been thinking about for this for a while because of Luigi Mangione. I have seen

the response to that and that situation . . . It was not an everyday thing and it extremely shook up everything. I pushed that away because I was thinking like that is so stupid, that accomplishes nothing, that poor kid just threw his life away for like a minute of vengeance. Vengeance is bullshit, no one feels good about that. I cannot see an average, ordinary person hurting someone else and feeling good about it and I know that's extremely naive, especially how he did it. It's some guy he never met before, he shot him in the back of the head- you can't feel proud about that. He's probably questioning his humanity every single day. But as time goes on and as time went on, I started to understand things differently in my own personal situation, not regarding Luigi, regarding mainly the foremost thing is time—the feeling of running out of time, but of holy shit it's me . . . I don't think I'm the Messiah or anything . . .  It's fate, it's destiny, it's whatever you want to call it."

- "So when you ask me what my plans were today, I really did not have any. For a while I've been thinking about doing everything I can to live for others… I just want to help and to take care of my friends before myself. I don't have the money to flee the country... I have been talking to my friends very recently about 'hey I really believe it's time to get out of the country and everything'. The thought of violence didn't occur to me until fairly recently and the thought of 'Holy shit it's me, it's my role unfortunately' not that there is a role and then it's me it's that I have a role and unfortunately it's violence. That's very important, it's the other way around."

The Defendant started planning a trip to Washington, D.C. one month ago, which included taking steps to mask any detection of the Defendant's true intention. The Defendant then assembled what the Defendant believed to be two capable Molotov cocktails and spent over an hour surveilling the grounds of the U.S. Capitol for how to carry out a plan to kill the nominee for Secretary of the Treasury. The nature and circumstances of these offenses weigh heavily in favor of detention.

### B.  <u>The Weight of the Evidence</u>

The weight of the evidence weighs heavily in favor of pretrial detention.   As discussed at length in an opinion by then Chief Judge Howell, the "weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." *United States v. Michael Blackson*, No. 23-CR-25 (BAH), ECF No. 18 at 20 (D.D.C. Feb. 6, 2023).   This is a "common-sense consideration," as "if the evidence against a defendant is overwhelming,

credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Id*.

Here, the evidence against the Defendant is strong. First, surveillance footage captures the Defendant arriving on the grounds of the U.S. Capitol at 1:57 PM that day and then walking around and surveilling the grounds for over an hour. Second, numerous witnesses observed the Defendant on the U.S. Capitol grounds, including the search of the Defendant. Officers identified the Defendant by the Defendant's own statements and a driver's license. Third, the government will present physical evidence found on the Defendant's person at trial, including: two 50 milliliter bottles of Absolut brand vodka with a grey cloth affixed to the top of each; a green BIC brand lighter; and a pocket knife. Additional physical evidence was recovered from the Defendant's car: an atlas; a 750 milliliter bottle of Smirnoff 100 proof vodka; and a grey sweatshirt with cloth cut from the sleeves (which was consistent with the cloth affixed to the Absolut brand vodka bottles found on the Defendant's person).

Additionally, the government will also introduce various statements by the Defendant, which were recorded on video. Notably, those statements include the following: "I've got a knife in my pocket, and Molotovs in my jacket" and "I was going to kill Scott Bessent."

Because the weight of the evidence is strong, it demonstrates that the Defendant is a danger to the community and strongly weighs in favor of detention.

## C.  <u>History and Characteristics</u>

The third factor, the history and characteristics of the person, also weighs in favor of detention.   The Defendant's recent conduct demonstrates an escalation in criminal behavior. As

stated during the custodial interview, the Defendant bought an atlas about a month ago and started to formulate a plan. Once the Defendant started driving, the Defendant "was making all of these plans in my head of what I could do", including:

- "I was planning on burning down [a Washington, D.C.-based think tank], which is near the White House. I was planning on getting there, asking and pretending . . . I was going to go there under the guise of I applied for an internship . . . I was going to go to the [think tank], tell them what they wanted to hear, and basically say that I was, 'oh I was emailing with [Individual-1] for a while, oh it must have been a scam, oh that's so unfortunate' and introduce myself . . . I was just thinking of ways to meet [Individual-1], so I could kill [Individual-1] with . . . I was going to just slit [Individual-1]'s throat because it was for revenge . . . I was going to go and do that, and if not that I was planning on burning down the building."

- "I was making all of these plans in my head of what I could do. If all else fails, I was going to slit my wrists on the White House steps. Just because that's all you can do if you can't hurt anyone else and you're out of options and you're out of time and you need to have an outlet and you need to show people how serious it is and you need to make one big dramatic fucking thing."

- "So, that's what I was going to do. I was gonna hurt big players. I really had such faith, that I was expecting to bump into someone who I would recognize and go for it. I was thinking, Trump's in LA right now for the fires, maybe I'll catch him on the way back, ram my car into him and just drive my knife into him and then just die in the process."

- "My thoughts and you know whatever, super incriminating stuff, SCOTUS, the Senate, running into Trump, and also like if all else were to fail, I could stake it out and just kind of like stay there like in the area and figure out what I wanted to do, whether it took days or weeks because I was kind of stuck there at that point."

But the Defendant did not merely *think* about a plan to kill the nominee; rather, the Defendant took multiple significant steps towards carrying out such a plan. The Defendant travelled overnight across multiple states, purposefully taking steps to conceal her movements from law enforcement. The Defendant arrived at the U.S. Capitol with what the Defendant believed to be two functioning Molotov cocktails and a knife. The Defendant then spent over an hour walking the grounds and surveilling the area. Upon arriving in D.C., the Defendant "realized all the buildings were giant

and brick and surrounded by military and police." But, as stated by the Defendant, she accepted that carrying out the plan would put herself in grave danger and expressed acceptance and content with the possibility of suicide by cop. The Defendant also accepted that the Defendant would have to kill, at least, three U.S. Capitol Police Officers to get to the nominee.

As mentioned above, the Defendant has stated that she was diagnosed with a terminal illness and "wanted to do something before I go." Defendant's statements during the custodial interview reflect a recklessness that demonstrates that no condition or combination of conditions would be sufficient to assure the safety of the community. For example, the Defendant told officers, "That's why I feel so okay with telling everyone everything because not only am I going to be either incarcerated or incinerated within weeks or months, doesn't matter so I might as well tell you everything that I tell the lawyers because it doesn't matter and I'm not afraid." As another example, the Defendant specifically mentioned being influenced by Luigi Mangione, the individual accused in the recent murder of United Health Group CEO Brian Thompson. The Defendant referred to her call to violence as "fate" or "destiny." Those statements, coupled with Defendant's statements that she has only a few months to live, demonstrate that the Defendant is a risk to the community if released.

Even if the Defendant were to present some conditional release plan involving someone who could house or watch the Defendant, such a plan would not be sufficient to ensure that safety of the community. In the hearing on January 28, the Court mentioned awareness of similar cases in which a defendant was released under a robust release plan. Assuming that the Court is referring to the *Hinton* [1] and/or *Olson* [2] cases, the government believes those cases are

---

[1] *United States v. Hinton*, 25-CR-26 (APM)
[2] *United States v. Olson*, 24-CR-550 (ABJ). The government will note it did not seek detention in this case.

distinguishable from the facts here. In *Hinton*, the defendant set his car on fire on United States Capitol grounds. 25-CR-26 (APM), ECF No. 9, at 2. When apprehended, the defendant admitted he set his car on fire to draw attention to his X feed (formerly Twitter), which he had spray painted onto his car. In *Olson*, the defendant brought a flare gun and bottles of gasoline into the Capitol Visitor Center, where he was apprehended while going through security. *See* 24-CR-550 (ABJ), ECF No. 1, at 2. He was also carrying an envelope with him and told officers when apprehended that his goal was to draw attention to the beliefs contained in the envelope. *Id.* at p. 4. Both individuals in *Hinton*, and *Olson* disavowed any intent to harm another individual. 24-CR-550 (ABJ), ECF No. 1, at 5; 25-CR-26 (APM), ECF No. 8, at 8. Here, however, the Defendant has expressed a desire to harm, and kill, numerous individuals, and took significant steps towards carrying out that intent with regards to the nominee.

### D. **Danger to the Community**

The fourth factor, the nature and seriousness of the danger to any person or the community posed by the defendant's release, also weighs in favor of detention.   The charged offense involves the Defendant's use of an incendiary device and demonstrates little regard for the safety of the employees at the U.S. Capitol.   In regards to the Defendant's intention, plan, and action to kill the nominee, Congress determined that such an offense carries with it a rebuttable presumption in favor of detention.   *See* 18 U.S.C. § 3142(e)(3)(C).   Once a rebuttable presumption has been triggered, the presumption operates at a minimum to impose a burden of production on the defendant to offer some credible evidence to the contrary. *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985).   And even if that happens, the presumption does not disappear entirely. *See United States v. Lee*, 195 F. Supp. 3d 120, 125 (D.D.C. 2016) (quoting *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("The presumption remains as a factor because it is not simply

an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial . . . To rebut the presumption, therefore, a defendant should "present all the special features of his case" that take it "outside the congressional paradigm")).

The Defendant traveled from Massachusetts to Washington, D.C. to kill the then-nominee for the Secretary of the Treasury Department. The Defendant took steps to avoid detection of her plan or actions.  The Defendant created what she believed were two Molotov cocktails.  The Defendant then took these Molotov cocktails and a knife to the U.S. Capitol grounds and surveyed the grounds for an hour. While the Defendant turned herself in to the police, the Defendant's statements afterwards demonstrate repeated, committed, and recurring desires and plans to harm individuals in Washington, D.C. with no concern for the consequences. This pattern raises serious concerns that the Defendant may once again attempt to engage in criminal activity because she does not approve of the current administration.

*****

## Conclusion

For all of the foregoing reasons, there are no conditions that can assure the safety of the community if the Defendant was released and the Defendant should be detained pending trial.

Respectfully submitted,

Edward R. Martin, Jr.
United States Attorney

By:     /s/ Justin F. Song
Justin Song
N.Y. Bar No. 5626379
Assistant United States Attorney
Monica Svetoslavov
D.C. Bar No. 252645
Special Assistant United States Attorney
United States Attorney's Office
601 D. Street, NW
Washington, DC 20579

23